G.H.H. INVESTMENTS,
L.L.C., Respondent,

v.

CHESTERFIELD MANAGEMENT
ASSOCIATES, L.P., Appellant.

No. ED 90778.

Missouri Court of Appeals,
Eastern District,
Division One.

Sept. 9, 2008.

Joe D. Jacobson, Clayton, MO, for appellant.

Joy D. McMillen, Chesterfield, MO, for respondent.

PATRICIA L. COHEN, Judge.

### Introduction

Chesterfield Management Associates, L.P. ("Seller") appeals the judgment of the Circuit Court of St. Louis County granting G.H.H. Investments, L.L.C.'s ("Purchaser") petition for specific performance of Seller's contract to sell real property to Purchaser ("Contract"). Section 7 of the Contract conditioned Purchaser's obligation to close on the property upon the satisfaction of certain zoning and approval contingencies. Section 11, the contractual provision governing the timing of closing, required the parties to close on the property thirty days after approval of Purchaser's development plan and record plats. Seller claims that the trial court erred in entering judgment for Purchaser because, by waiving the zoning and approval contingencies contained in Section 7, Purchaser concurrently waived those contingencies for purposes of triggering the timing of

closing under Section 11. In the alternative, Seller argues that the trial court erred in enforcing the Contract because the Contract was properly terminated by Seller. Finding no error, we affirm.

### Factual and Procedural Background

On April 21, 2004, Seller contracted to sell Purchaser 28.4 acres of real estate located at 14001 Olive Boulevard in Chesterfield, Missouri ("Property"). Purchaser is a limited liability company, co-managed by Michael Hejna and Brett Hardesty, that invests in commercial and residential real estate. Purchaser planned to develop 82 residential lots on the Property.

The Contract contained various contingencies that took into account the City of Chesterfield's ("City") "linear" zoning and development process. The City's zoning and development process consists of the following five steps: (1) rezoning the subject property; (2) approval of a final site development plan for the subject property; (3) approval of improvement plans for the subject property; (4) approval of the final record plat for the subject property; and (5) constructing improvements on the subject property. The City does not review any phase in this five-step process until the preceding step has been completed. Section 7 of the Contract, entitled "Zoning Contingency," conditioned Purchaser's obligation to close on the Property on: (1) the City rezoning the Property to a residential, R–3 PEU Zoning classification; and (2) the City and all other relevant authorities approving Purchaser's development plan and record plats.[1]

Purchaser submitted its application for rezoning to the City, along with the preliminary development plan, on September 27, 2004. Although Mr. Hardesty informed Seller during contract negotiations that Purchaser would be able to move the project through "the zoning process" in nine to twelve months, it later became

---

1. Section 7 of the Contract, entitled "Zoning Contingency," provided:

(a) This Contract and Purchaser's obligations hereunder are contingent upon the Property being rezoned to an R–3 PEU Zoning classification (or another classification reasonably acceptable to Purchaser) by the City of Chesterfield, Missouri (the "City"), and approval by the City and all other governmental and quasi-governmental authorities and public and private utilities having jurisdiction over the Property (the "Authorities") of Purchaser's development plan and record plates [sic] for the Property. Purchaser covenants and agrees to petition the Authorities for such zoning and approvals as soon as reasonably practicable after the Acceptance Date, and Seller covenants that it will cooperate with Purchaser in all reasonable manners requested in connection therewith.

(b) In the event the aforesaid rezoning or approvals are not granted on or before 9:00 P.M. on the 180th day after the Acceptance date (the "180th Day"), at the sole option of Purchaser, this Contract shall be terminated and the Letters of Credit shall be returned to Purchaser; provided, however, if on the 180th Day Purchaser's petitions and/or applications for rezoning or plan or plat approval are pending before a governmental authority having jurisdiction thereof, the aforesaid contingency period shall be automatically extended for three (3) successive sixty (60) day periods or until official action by way of grant or denial of such petitions and applications is received, whichever is earlier; provided that if Purchaser elects to exercise such option to extend, in lieu of the Letters of Credit (which shall be returned to Purchaser) Purchaser shall deposit Two Hundred Thousand and 00/100 Dollars ($200,000.00) cash with the Title Company as and for nonrefundable earnest money (the "Earnest Money") hereunder, which the Title Company shall pay to Sellers on the 180th Day; provided, however, such amount shall be applied to the Purchase Price if Purchaser completes the purchase of the Property hereunder. If so extended, Purchaser shall have until the expiration of such extended period(s) to exercise aforesaid option to terminate.

apparent that the zoning contingency would not be satisfied within the twelve-month period provided by the Contract. For this reason, the parties amended the Contract on December 29, 2004 ("Amendment"). Pursuant to the Amendment, Purchaser's time for satisfying the contingencies expired on December 27, 2005.[2] Both the Contract and Amendment were negotiated by Mr. Hardesty and Seller's attorney, Michael Kime.[3]

Significantly, nothing in the Amendment altered Section 11 of the Contract,[4] which was the only contract provision that concerned the time of closing. Section 11 set the date of closing on the thirtieth day after the latter of: (1) approval of Purchaser's development plan and record plats "in accordance with Section 7," or (2) waiver or satisfaction of the Clean Water Act contingency contained in Section 8.

The City granted Purchaser's petition to rezone the Property on November 7, 2005. On December 19, 2005, Purchaser's attorney, Michael Doster, wrote a letter to Seller's attorney, William Sauerwein, confirming the status of the Contract and the timing of closing. In this letter, Mr. Doster informed Mr. Sauerwein that rezoning had been approved but the other contingencies, such as approval of the development plan and record plat, had not yet been satisfied. Mr. Doster also indicated that the closing would take place thirty days after the approval of Purchaser's development plan and record plat. Mr. Doster and Mr. Kime discussed Mr. Doster's letter in a telephone conversation the following day.[5]

2. Section 2 of the Amendment provided as follows:

> Section 7(b) of the Contract is hereby deleted, and the following, which shall henceforth be deemed Section 7(b) of the Contract, is hereby substituted in its place:
> "(b) In the event the aforesaid zoning or approvals are not granted on or before 9:00 P.M. on the 30th day of June 2005, at the sole option of Purchaser, this Contract shall be terminated and the parties shall be released from all further obligations hereunder; provided, however, if on June 30, 2005, Purchaser's petitions and/or applications for rezoning or plan or plat approval are pending before an Authority, the aforesaid contingency period may be extended for three (3) successive sixty (60) day periods or until official action by way of grant or denial of such petitions and applications is received, whichever is earlier, by payment to Seller no later than the then scheduled date for expiration of the contingency contained in, Section 7, of $50,000.00 for the first such extension and $25,000.00 for each of the next two extensions thereafter; all such payments shall be deemed additional, nonrefundable earnest money under the Contract. Purchaser shall have until the expiration of such extended period(s) to exercise its aforesaid option to terminate."

3. The trial court found that both parties and their respective individual owners and representatives were sophisticated business parties for purposes of negotiating the Contract and Amendment.

4. Section 11 of the Contract stated:
> *Closing.* (a) The consummation of the purchase and sale of the Property shall take place at a closing (the "Closing") to be held at the Title Company (or at such other place as the parties may mutually agree) on the thirtieth (30th) day after the latter of (i) approval of Purchaser's development plan and record plats for the Property by the Authorities in accordance with Section 7, or (ii) waiver or satisfaction of the contingency contained in Section 8 of this Contract.

5. At trial, Mr. Kime testified that he did not recall specific details of that conversation. Mr. Doster testified that he specifically recalled that he and Mr. Kime discussed the timing of the closing. According to Mr. Doster, Mr. Kime expressed his understanding that the closing would occur 30 days after expiration of the waivers. When Mr. Doster directed Mr. Kime's attention to Section 11 and reiterated his position that the time of closing was 30 days after the approval of the record plat not expiration of the Section 7

On December 27, 2005, Mr. Doster wrote a letter to Mr. Sauerwein electing not to terminate the Contract under Paragraphs 7(b) or 8(b), thereby waiving the zoning, development plan, record plat, and Clean Water Act contingencies. This letter constituted timely waiver by Purchaser of the remaining contingencies under the Contract and Amendment, which effectively bound both parties to the Contract and obligated Purchaser to purchase the property.

On December 29, 2005, Mr. Kime wrote a letter to Mr. Doster declaring that Seller would not permit Purchaser to defer closing past the thirtieth day after December 27, 2005, the date on which Purchaser waived the Section 7(b) and 8(b) contingencies. In subsequent letters, dated January 4, 2006 and January 16, 2006, Mr. Kime asserted that Purchaser breached the Contract by failing to petition for development plan and plat approval as soon as "reasonably practicable" and that Seller would look for an alternative purchaser for the Property or develop the Property itself if Purchaser failed to close by January 27, 2006.

In response to Seller's threats to find another purchaser or self-develop the Property, Purchaser filed its Petition for Specific Enforcement, Declaratory Judgment and Injunctive Relief ("Petition") on January 23, 2006. Purchaser asked the trial court to: (1) declare that the Contract required the closing to occur on the thirtieth day after the City approved the record plat, the fourth stage in the City's development process; (2) to order Seller to specifically perform its obligations under the Contract; and (3) to enjoin Seller from selling the Property to another purchaser. Seller filed a counterclaim for damages, which the trial court dismissed with prejudice to the extent that it sought any damages in excess of the $250,000 provided by the Contract's liquidated damages clause.

After a four-day bench trial, the trial court entered judgment in favor of Purchaser and against Seller on all counts of the Petition and Counterclaim. In its Findings of Facts and Conclusions of Law, the trial court stated that Section 11 of the Contract did not require Purchaser to close on the Property on or before January 27, 2006 because Purchaser's development plan and record plats had not yet been approved. The trial court further found that Seller's threats to self-develop the Property and/or find an alternative buyer constituted anticipatory breach of the Contract and Amendment. Finally, the trial court concluded that Purchaser petitioned the City and relevant authorities for zoning and approvals as soon as reasonably practicable. Seller appeals.

### Standard of Review

■ As this matter is an appeal from a court-tried case, the standard of review is governed by *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo.1976) (en banc). The judgment will be affirmed unless it is against the weight of the evidence, there is insufficient evidence to support it, or it erroneously declares or applies the law. *Pelligreen v. Wood,* 111 S.W.3d 446, 450 (Mo.App. E.D.2003). We defer to the factual findings of the trial court, which is in a superior position to assess credibility. *Id.* However, this Court independently evaluates the trial court's conclusions of law. *Id.* Contract interpretation and questions of contractual ambiguity are issues of law, which we review de novo on appeal. *Mon-*

waiver, Mr. Kime allegedly replied "Oh, you're right." The trial court deemed Mr. Doster's recollection credible.

santo Co. v. Syngenta Seeds, Inc., 226 S.W.3d 227, 230 (Mo.App. E.D.2007).

### Discussion

#### 1. Waiver of Contingency

In its first point, Seller argues that the trial court erred in holding that Purchaser's waiver of the approval contingencies provided for in Section 7 did not operate to waive those same contingencies for purposes of the Section 11 closing provision. Seller asserts that waiver of a contingency for one part of a contract necessarily waives that contingency as it relates to the entire contract. We disagree.

"The cardinal rule in the interpretation of a contract is to ascertain the intention of the parties and to give effect to that intention." *J.E. Hathman, Inc. v. Sigma Alpha Epsilon Club*, 491 S.W.2d 261, 264 (Mo. 1973) (en banc). If a contract contains no ambiguities, the intent of the parties is to be gathered from the contract alone.[6] *Id.* Therefore, evidence of how the contract was understood or acted upon by the parties is only used when the contract or a contract term is unclear. *Smith v. Taylor–Morley, Inc.*, 929 S.W.2d 918, 922 (Mo. App. E.D.1996).

We find the Contract to be unambiguous. "Where a contract speaks plainly and unequivocally, language used must be enforced as written." *Kramer v. Fallert*, 628 S.W.2d 671, 674 (Mo.App. E.D.1981). Sec-tion 11 of the Contract clearly and unambiguously states that the parties are to close on the Property on the thirtieth day after the latter of (i) *approval* of Purchaser's development plan and record plats or (ii) *waiver or satisfaction* of the Clean Water Act contingency. The terms "approval," "waiver," and "satisfaction" are distinct legal terms to which we must attribute their plain meaning.[7] Section 11(a)(i) clearly conditions the closing date on Chesterfield's approval of Purchaser's development plan and record plats. If the parties had intended waiver of the development plan and record plat approval to trigger the closing, they could have employed the language "waiver or satisfaction" in Section 11(a)(i) as they did in Section 11(a)(ii). Instead, the Contract makes clear that the only contingency and waiver of contingency relevant to triggering the date of closing is the Section 8(b) Clean Water Act contingency referred to in Section 11(a)(ii). Waiver of the Section 7(b) approval contingencies is not relevant to the timing of the closing.

"The waiver of one right under a contract does not necessarily waive other rights under the contract; rather, the parties to a contract may waive portions of its provisions." SAMUEL WILLISTON, A TREATISE ON THE LAW OF CONTRACTS § 39:18 (4th ed.2000). The extent to which the waiver of a contingency in one section of the

---

6. In determining whether contract language is ambiguous, we look at the context of the entire agreement and determine if the language, given its plain and ordinary meaning, is reasonably susceptible to more than one interpretation. *Boyer v. Sinclair & Rush, Inc.*, 67 S.W.3d 627, 631 (Mo.App. E.D.2002). The fact that the parties to a contract disagree about the proper construction to be given it does not render the contract ambiguous. *Smith v. Taylor–Morley, Inc.*, 929 S.W.2d 918, 922 (Mo.App. E.D.1996).

7. *Black's Law Dictionary* defines "approval" as "[t]he act of confirming, ratifying, assenting, sanctioning or consenting to some act or thing done by another. Black's Law Dictionary 102 (6th ed.1990)." "Waiver" means "the intentional or voluntary relinquishment of a known right." Black's Law Dictionary 1580 (6th ed.1990). "Satisfaction" is defined as the "discharge of an obligation by paying a party what is due to him" or the "performance of a substituted obligation in return for the discharge of the original obligation." Black's Law Dictionary 1342 (6th ed.1990).

contract affects the rest of the contract depends upon "the nature of the provision waived and the intention of the parties." *Id.*

■ Seller points to various provisions in the Contract and Amendment as support for its argument that the parties intended waiver of the Section 7 contingencies to trigger the Section 11 closing provision. First, Seller argues that inclusion of the language "by the Authorities in accordance with Section 7" in Section 11(a)(i) necessarily incorporates the development plan and record plat approval contingencies into the Section 11 closing date provision. Specifically, Seller asserts that because Sections 7 and 11 point to the occurrence or waiver of the same event—the Authorities' approval of Purchaser's development plan and record plats—Purchaser's act of waiving this contingency for purposes of Section 7 triggered its obligation to close under Section 11. We disagree.

The phrase "by the Authorities in accordance with" as it is used in Section 11(a)(i) is not ambiguous. We find that this phrase refers to Section 7's definition of the term "Authorities" and not the method for approval. As Purchaser acknowledged in its brief, the Contract might have been clearer if this provision read "by the Authorities *identified in* Section 7." However, in the context of Paragraph 11 and the Contract as a whole, the phrase "in accordance with" neither creates an ambiguity nor induces us to read the word "approval" in Section 11(a)(i) to include waiver of approval.

Seller cites *Maupin v. Southern Surety Co.* for the proposition that words used in various parts of a contract are to be given

the same meaning throughout. 205 Mo. App. 81, 220 S.W. 20, 21 (1920). This rule of contract interpretation offers no guidance in the instant case, as the meaning of the terms "zoning," "approval," and "waiver or satisfaction" are not at issue.[8] Nothing in *Maupin* or any other case cited by Seller suggests that waiver of a contingency for purposes of one contract provision necessarily waives that contingency as it relates to all other provisions in the contract.

■ Seller also claims that the Amendment's "whereas" clauses, or recitals, indicate that all of the contingencies were referred to generally as "zoning," and, under the Amendment, Purchaser was granted 180 days to rezone *and* obtain development plan and record plat approvals for the Property. The preamble of the Amendment provides:

WHEREAS, under Section 7 of the Contract, Purchaser was granted 180 days to rezone and obtain development plan and record plat approvals for the Property (the "Contingency"); and

WHEREAS, Purchaser was not able to satisfy the Contingency within the allotted period, and has requested an extension; and

WHEREAS, on the terms herein provided, Seller is willing to grant such an extension.

While this language may support Seller's interpretation of the contract, "recitals are not strictly a part of the contract because they do not impose contractual duties on the parties." *Missouri Highway & Transp. Comm'n v. Maryville Land P'ship,* 62 S.W.3d 485, 492 (Mo.App. E.D. 2001). The purpose of recitals is to shed light on the circumstances the parties wish

---

**8.** In fact, in *Taylor–Morley, Inc.,* we held that the terms "plat approval" and "zoning" are distinct terms that refer to separate phases of the real estate development process. 929 S.W.2d at 922.

to have considered in interpretation of the contract. *Id.* Therefore, Missouri courts look to the recitals to determine the intent of the parties when the operative language is ambiguous, uncertain, or indefinite. *Id.* Because Sections 7 and 11 of the Contract and Amendment are clear and unambiguous, the plain meaning of these operative sections prevails over the Amendment's recitals.

█ Seller's central argument, which it seeks to support with the above-discussed contract language, is that Purchaser's December 27, 2005 waiver of the approval contingencies for purposes of making the Contract binding triggered Purchaser's obligation to close thirty days thereafter. In Missouri, it is well-settled that a party to a real estate contract may waive any condition in that party's favor and enforce the other party's duty to perform under the contract. *Pelligreen v. Wood,* 111 S.W.3d 446, 451 (Mo.App. E.D.2003) ("If a condition is waived the parties are subsequently bound to perform their duties under the contract."). Seller fails to cite and we find no precedent supporting the proposition that waiver of a condition for one purpose constitutes waiver of that condition as it relates to all other terms of the contract. If the parties intended Purchaser's waiver of the approval contingency to trigger the closing date, the Contract would have so stated. *See e.g., Taylor–Morley, Inc.,* 929 S.W.2d at 922. Because no such express language exists in Section 11 of the Contract, we find that Purchaser did not waive that condition for the purpose of triggering the closing date.

We also reject Seller's argument that under the trial court's interpretation of the Contract, Purchaser's waiver of the Section 7 contingencies is meaningless be-

cause it would never obligate Purchaser to complete the purchase.[9] As previously stated, waiver of the Section 7 contingencies obligated Purchaser to perform on the Contract. Importantly, Section 7 requires Purchaser to petition the City and other relevant authorities for "zoning and approvals as soon as reasonably practicable." Pursuant to Section 11, the parties close 30 days after obtaining record plat approval. Because Purchaser was required to diligently undertake all steps of the development process and the Contract provided for closing 30 days after issuance of plat approval, it is not indefinite in duration. The trial court's interpretation of the Contract does not allow Purchaser "to keep the Property tied up indefinitely" because, if Purchaser failed to petition the City for zoning and approvals as soon as reasonably practicable, Seller would have a cause of action for breach of contract. Accordingly, the trial court did not err in finding that Purchaser did not waive plan and plat approval for the purpose of triggering the Section 11 closing date. Point denied.

### 2. Contract Duration and Termination

█ In its second point on appeal, Seller claims that if the trial court did not err in determining that the approval contingencies were waived for purposes of Section 7 and not Section 11, then it erred in enforcing the Contract because Seller properly terminated the Contract. Seller argues that the Contract was one of indefinite duration and, therefore, terminable at will. Seller contends that it properly terminated the Contract by means of Mr. Kime's letter of December 29, 2005. We disagree.

█ Seller cites *Armstrong Business Services, Inc. v. H & R Block,* 96 S.W.3d

---

**9.** This subargument overlaps with Seller's second point on appeal that the Contract is one of indefinite duration. To the extent that

it relates to the significance of Purchaser's election to waive the various contingencies, we briefly address it here.

867, 876 (Mo.App. W.D.2002) for the well-known proposition that a contract of indefinite duration is terminable at the will of either party. *See also Kopp v. Home Furnishing Center, LLC,* 210 S.W.3d 319, 326 (Mo.App. W.D.2006). However, the Contract's duration was not indefinite. The condition triggering Purchaser's obligation to pay—specifically, plat approval—was expressly set forth in the Contract, and the date set for closing was 30 days after obtaining said approval. Further, the Contract obligated Purchaser to petition the City for record plat approval, as well as rezoning, site development plan approval, and site improvement plan approval, as soon as reasonably practicable. The fact that "it is not possible to put the Closing date on a calendar," does not mean that the Contract's duration was indefinite. Time for performance may be specifically determined by external events. *Lowery v. Air Support Internat'l, Inc.,* 982 S.W.2d 326, 329 (Mo.App. S.D.1998). Because the contract was not indefinite, Seller had no right to terminate the Contract and, like Purchaser, is bound to the Contract.

"Missouri law recognizes the doctrine of anticipatory breach by repudiation and a party to a contract repudiates that contract by manifesting, by words or conduct, a positive intention not to perform." *Jetz Serv. Co. v. Botros,* 91 S.W.3d 157, 163 (Mo.App. W.D.2002). Seller's letter of December 29, 2005 threatening to self-develop and/or sell the Property to an alternative purchaser constituted anticipatory breach. Consequently, the trial court did not err in enforcing the contract. Point denied.[10]

10. In its third and final point on appeal, Seller argues that the trial court erred in limiting Seller's counterclaim to the liquidated damages provision in the Contract. Because we

*Conclusion*

The judgment of the trial court is affirmed.

KURT S. ODENWALD, P.J., Concurs.

GLENN A. NORTON, J., Concurs.

find that the trial court did not err in entering judgment for Purchaser and denying Seller's Counterclaim, we do not address Seller's final point.